## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| MONICA MEEKS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 3:25-cv-01431 |
| CARTER LAWRENCE, in his individual and | ) | Judge Aleta A. Trauger |
| official capacities as Commissioner of Tennes- | ) | |
| see Department of Commerce and Insurance | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 2

    A.  Mr. Kirk is publicly murdered. .................................................................. 2

    B.  Ms. Meeks casts Mr. Kirk and his supporters as white supremacists. ...................... 3

    C.  The Department terminates Ms. Meeks's employment. ............................................. 4

    D.  Ms. Meeks files this lawsuit. ........................................................................... 7

LEGAL STANDARDS ..................................................................................................... 7

ARGUMENT ................................................................................................................ 8

    I.  Ms. Meeks Did Not Engage in Protected Conduct. ............................................. 8

    A.  Ms. Meeks has little First Amendment interest in her conduct here. ...................... 9

    B.  The Department's interest in effectively serving all Tennesseans is substantial. .... 11

    C.  The Department's interests outweigh Ms. Meeks's, so her conduct is unprotected... .............................................................................................. 15

    II.  Even if Ms. Meeks's Conduct Were Protected, That Was Not Clearly Established When the Department Terminated Her Employment. .................................... 16

CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*Anzaldua v. Ne. Ambulance & Fire Prot. Dist.,*
793 F.3d 822 (8th Cir. 2015) ................................................................................................ 15

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................................... 7

*Barber v. Miller,*
809 F.3d 840 (6th Cir. 2015) ................................................................................................ 17

*Bd. of Cnty. Commissioners, Wabaunsee Cnty., Kansas v. Umbehr,*
518 U.S. 668 (1996) ............................................................................................................. 16

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................................ 8, 15

*Bendix Autolite Corp. v. Midwesco Enters., Inc.,*
486 U.S. 888 (1988) ............................................................................................................. 19

*Bennett v. Metro. Gov't of Nashville & Davidson Cnty.,*
977 F.3d 530 (6th Cir. 2020) ........................................................................................ passim

*Buddenberg v. Weisdack,*
939 F.3d 732 (6th Cir. 2019) ................................................................................................. 7

*Connick v. Myers,*
461 U.S. 138 (1983) ............................................................................................................. 16

*Crawford v. Tilley,*
15 F.4th 752 (6th Cir. 2021) ........................................................................................... 7, 16

*Curran v. Cousins,*
509 F.3d 36 (1st Cir. 2007) .................................................................................................... 9

*Darlingh v. Maddaleni,*
142 F.4th 558 (7th Cir. 2025) ................................................................................................ 9

*Davignon v. Hodgson,*
524 F.3d 91 (1st Cir. 2008) .................................................................................................... 9

*DeCrane v. Eckart,*
12 F.4th 586 (6th Cir. 2021) ............................................................................... 8, 9, 15, 16

*DeVooght v. City of Warren, Michigan,*
157 F.4th 893 (6th Cir. 2025) .............................................................................................. 17

*DiMeglio v. Haines,*
45 F.3d 790 (4th Cir. 1995) ............................................................................... 19

*Duke v. Hamil,*
997 F. Supp. 2d 1291 (N.D. Ga. 2014) ............................................................. 11

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) .......................................................................................... 9

*Garvie v. Jackson,*
845 F.2d 647 (6th Cir. 1988) ........................................................................... 18

*Gillis v. Miller,*
845 F.3d 677 (6th Cir. 2017) ................................................................. 13, 15, 19

*Grutzmacher v. Howard Cnty.,*
851 F.3d 332 (4th Cir. 2017) ..................................................................... 10, 13

*Guercio v. Brody,*
911 F.2d 1179 (6th Cir. 1990) ................................................................... *passim*

*Hedgepeth v. Britton,*
152 F.4th 789 (7th Cir. 2025) ......................................................................... 11

*Hussey v. City of Cambridge,*
720 F. Supp. 3d 41 (D. Mass. 2024) ...................................................... 10, 11, 13

*Livermore v. City of Petersburg,*
844 F.3d 400 (4th Cir. 2016) ......................................................................... 10

*Locurto v. Giuliani,*
447 F.3d 159 (2d Cir. 2006) ........................................................................... 12

*Lyons v. City of Xenia,*
417 F.3d 565 (6th Cir. 2005) ......................................................................... 17

*Marquardt v. Carlton,*
No. 21-3832, 2023 WL 395027 (6th Cir. 2023) ....................................... 11, 19

*McElhaney v. Williams,*
81 F.4th 550 (6th Cir. 2023) ......................................................................... 17

*Murrell v. Patriot Front,*
762 F. Supp. 3d 65 (D. Mass 2025) ............................................................... 17

*Myers v. City of Centerville,*
41 F.4th 746 (6th Cir. 2022) ......................................................................... 20

*Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.,*
112 F.4th 373 (6th Cir. 2024) .................................................................. 9, 19

iii

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ........................................................................................... 20

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,*
    391 U.S. 563 (1968) ...................................................................................... *passim*

*Pleasant View Baptist Church v. Beshear,*
    78 F.4th 286 (6th Cir. 2023) ............................................................................17, 18

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ...................................................................................... *passim*

*Rhodes v. Michigan,*
    10 F.4th 665 (6th Cir. 2021) .............................................................................17, 19

*Roane Cnty., Tenn. v. Jacobs Eng'g Grp., Inc.,*
    No. 3:19-CV-206-TAV-HBG, 2020 WL 2025613 (E.D. Tenn. Apr. 27,
    2020) ................................................................................................................. 3

*Schenck v. United States,*
    249 U.S. 47 (1919)............................................................................................. 8

*Shirinian v. Plowman,*
    No. 3:25-cv-528-KAC-JEM, 2025 WL 3680503 (E.D. Tenn. Dec. 18, 2025)....11, 12, 15, 19

*Siefert v. Hamilton Cnty.,*
    951 F.3d 753 (6th Cir. 2020) .............................................................................. 20

*Skousen v. Brighton High Sch.,*
    305 F.3d 520 (6th Cir. 2002) .............................................................................. 20

*Summers v. Leis,*
    368 F.3d 881 (6th Cir. 2004) .............................................................................. 20

*Thomas v. Tenneco Packaging Co., Inc.,*
    293 F.3d 1306 (11th Cir. 2002) .......................................................................10, 13

*Vanderhoef v. Dixon,*
    938 F.3d 271 (6th Cir. 2019) .............................................................................. 17

*Waters v. Churchill,*
    511 U.S. 661 (1994) .......................................................................................... 16

*Watts v. Fla. Int'l Univ.,*
    495 F.3d 1289 (11th Cir. 2007) ........................................................................... 9

*White v. Pauly,*
    580 U.S. 73 (2017)............................................................................................ 17

iv

*Zajaros v. Volvo Car Corp.*,
   No. 3:23-cv-951-AAT, 2025 WL 1762963 (M.D. Tenn. June 25, 2025) ................................. 4

**Statutes & Regulations**

42 U.S.C. § 1983 ................................................................................................................ 6, 7

Tenn. Comp. R. & Regs. 1120-10-.03 ................................................................................... 6

## INTRODUCTION

Political commentator Charlie Kirk was gruesomely murdered in public while trying to engage in political debate. When a Facebook friend eulogized Mr. Kirk and encouraged others to take up his political advocacy, Plaintiff Monica Meeks publicly accused him of "tap danc[ing] for White Supremacist[s]," casting Mr. Kirk's views and those who share them as contemptable and racist. Her employer—the Tennessee Department of Commerce and Insurance—determined that this baseless accusation targeting many Tennesseans who share Mr. Kirk's views would disrupt and impair the Department's and Ms. Meeks's work. Accordingly, the Department let Ms. Meeks go. She now sues the Department's Commissioner, Carter Lawrence, in his individual and official capacities, claiming her firing violates the First Amendment. But her First Amendment retaliation claim falls short, and regardless, Commissioner Lawrence is entitled to qualified immunity.

To make out her First Amendment retaliation claim, Ms. Meeks must establish that her interest in publicly attacking Tennesseans whom she disagrees with politically outweighs the Department's interest in operating effectively for *every* citizen in the State. She can't. At most, Ms. Meeks had only a minimal interest in baselessly accusing citizens she serves of "White Supremac[y]," while the Department has a significant interest in maintaining complete public confidence in the integrity of its investigations. Because Ms. Meeks cannot establish that she engaged in protected conduct, her First Amendment retaliation claim fails as a matter of law.

Even if the Court disagrees about the balance of interests here, Commissioner Lawrence is entitled to qualified immunity. State officials are only liable for constitutional violations that are clearly established by law. When the Department terminated Ms. Meeks, no case clearly established that her interest in castigating the Department's customers with whom she disagrees outweighs the Department's interest in avoiding the disruptive consequences of that action. Because reasonable minds

1

could at least debate whether the First Amendment protected Ms. Meeks's conduct, qualified immunity bars her claims against Commissioner Lawrence in his individual capacity.

## BACKGROUND

### A. Mr. Kirk is publicly murdered.

Mr. Kirk was a political commentator and the founder of Turning Point USA. Turning Point bills itself as "the largest and fastest-growing conservative youth activist organization in America." Turning Point USA, *Our Founder*, https://perma.cc/W2DE-ELYT. Its stated mission is to "equip[] the next generation with the tools and knowledge to defend and promote conservative values" on college campuses by promoting "open dialogue and thought[-]provoking discussion" at on-campus events. *See* Turning Point USA Students, *About Us*, https://www.tpusastudents.com/aboutus.

On September 10, 2025, Mr. Kirk attended a Turning Point event at Utah Valley University. *See* Compl. ¶ 35-38, ECF No. 1. Mr. Kirk set up a stage that day in Utah Valley's outdoor amphitheater and invited citizens with opposing views to debate him on various political and cultural topics. Shortly after Mr. Kirk took the stage and readied himself for respectful debate, a gunshot rang out. An assassin's bullet struck Mr. Kirk in front of the large crowd that had gathered to see him. Blood immediately poured from his neck, and he collapsed to the ground.

Chaos ensued. Students and onlookers scattered in panic looking for shelter. Mr. Kirk's security detail rushed to his aid. For a significant time, the public did not know Mr. Kirk's fate or the whereabouts of the shooter.

Meanwhile, grisly videos of the shooting circulated on the internet. Many on social media expressed horror. Allie Beth Stuckey (@conservmillen), X (Sept. 10, 2025, at 3:05 p.m. CT), https://perma.cc/X64L-UZ7N. Others, including the White House, voiced concern about Mr. Kirk's well-being and called for prayers. The White House (@WhiteHouse), X (Sept. 10, 2025, at 2:07 p.m. CT), https://perma.cc/3MLQ-HHN3. But some online offered commentary that was nearly as

2

heartless as the act itself. *See* End Wokeness (@EndWokeness), X (Dec. 11, 2025, at 1:28 p.m. CT), https://tinyurl.com/bvva6hhm. Indeed, major news outlets have reported experts' concerns that these online celebrations and posts "signal a dangerous mainstream shift in politics." Andrew Mark Miller & Charles Creitz, *Experts warn leftist celebrations of Charlie Kirk's death signal a dangerous mainstream shift in politics*, Fox News (Sept. 19, 2025), https://perma.cc/7E3L-GLPN. Eventually, President Trump announced that Mr. Kirk had succumbed to his injuries. The White House (@WhiteHouse), X (Sept. 10, 2025, at 3:50 p.m. CT), https://perma.cc/25E9-GEL5.[1]

## B. Ms. Meeks casts Mr. Kirk and his supporters as white supremacists.

A day later, a friend of Ms. Meeks posted to his Facebook eulogizing Mr. Kirk. Compl. ¶ 38. The post highlighted the significance and legitimacy of Mr. Kirk's political views, praising Mr. Kirk's advocacy for those positions. *Id.* It called on others who share Mr. Kirk's views to pick up the baton that had been taken from him by the assassin's bullet and advance his political positions themselves. *Id.* Addressing Mr. Kirk's assassin, the post pointed out the "cowardice" of the shooter violently attacking Mr. Kirk rather than engaging in debate. *Id.* It contended that the assassin had not "silence[d]" Mr. Kirk's message but instead had "prove[n]" its power. *Id.* According to the post, the assassin did not "kill" Mr. Kirk's "voice," it "amplified it." *Id.* It reasoned that the shooter "feared" Mr. Kirk's "words because they're stronger than … bullets," reiterating praise for Mr. Kirk's views and his advocacy. *Id.*

Moreover, Ms. Meeks's friend contended that the assassin had unwittingly "gr[own]" Mr. Kirk's movement. *Id.* He announced that Mr. Kirk's "fight is OUR fight. And we will NEVER back

[1] The web posts and articles cited above are meant solely to provide the Court with context around Mr. Kirk's murder. Commissioner Lawrence does not rely on them for facts relevant to his arguments for dismissal. In any event, "such sources" generally "can be judicially noticed for [proving] that a fact was printed or 'that a collection of numerous articles … show[s] that a fact was widely known.'" *Roane Cnty., Tenn. v. Jacobs Eng'g Grp., Inc.*, No. 3:19-CV-206-TAV-HBG, 2020 WL 2025613, at *4 (E.D. Tenn. Apr. 27, 2020) (quotation omitted).

down," rallying citizens who share Mr. Kirk's political beliefs to continue advancing those views despite the shooter's violent act. *Id.* Indeed, the post concludes with a call to action. Superimposed over a contemplative image of Mr. Kirk is a warning to the shooter: "YOU HAVE AWAKENED A GIANT." *Id.*

Ms. Meeks lambasted this post commemorating Mr. Kirk and his political advocacy. In response to the post's eloquently encouraging others who share Mr. Kirk's political views to carry forward his legacy, Ms. Meeks posted a comment accusing her friend of "tap danc[ing] for White Supremacist[s]." *Id.* She thereby made clear her belief that Mr. Kirk and others who share his political views are racists who privilege white citizens over other races. *Id.*

Ms. Meeks's comment went viral. The next day, several X (formerly Twitter) users began sharing Ms. Meeks's comment on the platform. *See id.* ¶¶ 41-44. These users expressed dismay that Ms. Meeks had typecasted large swaths of the population she is meant to serve as reprehensible, illegitimate, and racist simply because they hold different political beliefs. *See id.* Nearly 100,000 users have viewed these X posts. *See id.* ¶ 42.

### C. The Department terminates Ms. Meeks's employment.

The Department's mission is to "[p]rotect[] Tennesseans" from insurance and securities fraud, while "empowering professionals" in the State by overseeing regulatory boards that "regulate several hundred thousand Tennesseans in their professions and businesses." Tenn. Dep't of Com. & Ins., *Our Mission, Vision & Values*, https://tinyurl.com/4ufudnvx; *See* Tenn. Dep't of Com. & Ins., *Regulatory Boards*, https://tinyurl.com/5djh329a.[2] It achieves these goals through an "efficient [and] strategic," "[c]ustomer[-]centered" operation carried out by "ethical [and] transparent, respectful [and] engaged, and innovative leaders." *See* Tenn. Dep't of Com. & Ins., *Our Mission, Vision & Values*,

---

[2] "[C]ourts can take judicial notice of facts reflected on government websites." *Zajaros v. Volvo Car Corp.*, No. 3:23-cv-951-AAT, 2025 WL 1762963, at *4 (M.D. Tenn. June 25, 2025).

https://tinyurl.com/4ufudnvx. The Department thereby serves all Tennesseans "through balanced oversight of insurance and regulated professions while enhancing customer advocacy, education, and public safety." *Id.* In particular, the Department ensures "the success of professionals who serve our community" by facilitating and overseeing "the education and licensing [that professionals] need to provide consumers with the best possible service." *Id.* And the Department "provides consumer[-]oriented services," like enforcing state insurance laws to help "Tennesseans find the best insurance options to meet their need" and "regulat[ing] Tennessee investment advisors to protect consumers against investment fraud." *Id.*

At the time she made her incendiary comment, Ms. Meeks worked at the Department as a financial services investigator. Compl. ¶¶ 2, 21, 27. In that role, Ms. Meeks was responsible for investigating alleged insurance and securities fraud by, among other things, collecting evidence through documentation, witness interviews, and interactions with the public. *See id.*; *see also* Tenn. Dep't of Com. & Ins., *File a Complaint*, https://tinyurl.com/32s3jh58; Tenn. Dep't of Com. & Ins., *Securities/Investment Complaint*, https://tinyurl.com/4hczhrby; Tenn. Dep't of Com. & Ins., *Insurance Agent/Agency Complaint*, https://tinyurl.com/3k8neauj. Ms. Meeks also gave public presentations in her role as an investigator. Compl. ¶ 49. For example, in 2021, she spoke at an event put on by the American Association of Retired Persons about fraud prevention for veterans. *Id.*

The Department eventually learned of Ms. Meeks's viral social media post, as X users inundated the Department's X account with screenshots of the Facebook exchange and angry calls for action. *See id.* ¶¶ 41-46. Upon investigation, the Department confirmed that it would be clear to the public based on her internet footprint that Ms. Meeks worked at the Department—and in a capacity that requires public trust. *See id.* ¶¶ 46-49, 65. Commissioner Lawrence weighed how to proceed.

The State has, by regulation, identified "acts that may warrant disciplinary action," including "[c]onduct unbecoming of an employee in state service" and actions that "seriously disrupt or disturb

the normal operations" or "that would interfere with the ability of management to manage."  Tenn. Comp. R. & Regs. 1120-10-.03(11), (15).  The State's Code of Conduct also emphasizes state employees' "responsibility to the citizens of the State of Tennessee to act with integrity and to treat the people [they] serve, [their] colleagues, and other parties with dignity and respect."  State of Tenn., *Code of Conduct*, https://tinyurl.com/mujxtzuw.[3]  It directs employees "to maintain an ethical and professional environment that will enhance the name, service and general impression of the State in the eyes of the general public."  *Id.*  Indeed, employees must "conduct themselves in a manner that creates and maintains respect for their work sites, fellow employees and customers, their respective agencies or departments and the State of Tennessee."  *Id.*  They "are expected to treat others with respect, courtesy and dignity and conduct themselves in a professional manner."  *Id.*  And state employees have "an obligation to perform [their] job in a manner" consistent with the State's Code.  *Id.*  Failing to do so "may subject [an] employee to disciplinary action."  *Id.*

Commissioner Lawrence determined that Ms. Meeks's viral comment attacking the political views held by many of the citizens she serves fell short of these standards and was likely to cause serious internal and external disruption.  The comment, he explained, was "inflammatory," "incendiary," and "insulting," and it "brought extremely negative attention to [Ms. Meeks's] face and name," which the public and coworkers could reasonably impute to her functions at the Department.  Compl. ¶¶ 55-56, 58, 65.  For example, the Department was concerned that citizens who share Mr. Kirk's views—whether a complainant, the target of an investigation, an investigatory witness, or a coworker—could no longer trust that Ms. Meeks's investigations would be unbiased.  *See id.* ¶ 65.  In light of Ms. Meeks's viral social media post, these citizens could reasonably fear that she would discount their legitimate concerns, input, and positions as merely the racist pretexts of a "White

---

[3] The Code of Conduct is published on a state website, and it is referenced in the Complaint.  *See* Compl. ¶ 58.

Supremacist," significantly compromising the perceived integrity of her investigations. *See id.* ¶¶ 38, 55-56, 58, 65. To avoid these disruptive effects, Commissioner Lawrence terminated Ms. Meeks's employment.

### D. Ms. Meeks files this lawsuit.

Ms. Meeks filed this suit against Commissioner Lawrence in his individual and official capacities, alleging a single count under 42 U.S.C. § 1983. Compl. ¶¶ 22-25, 86-95. According to Ms. Meeks, her Facebook comment casting Mr. Kirk and his supporters as racist white supremacists was First Amendment-protected activity and her termination amounted to unlawful retaliation. *See id.* ¶¶ 87-90. Commissioner Lawrence now moves to dismiss the Complaint based on Ms. Meeks's failure to state a claim for First Amendment retaliation and because he is entitled to qualified immunity.

## LEGAL STANDARDS

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Crawford v. Tilley*, 15 F.4th 752, 762 (6th Cir. 2021). In other words, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Courts must draw upon their "judicial experience and common sense" to decide whether the claims are "plausible." *Id.* (quoting *Iqbal*, 556 U.S. at 679). And "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

The "qualified-immunity inquiry" at the motion to dismiss stage has two components. *Id.* First, the facts alleged must make out a violation of a constitutional right. *Id.* Second, that infringed right must have been "clearly established when the event occurred so that a reasonable officer would have known that his conduct violated it." *Id.* at 762-63 (quoting *Buddenberg v. Weisdack*, 939 F.3d 732, 738 (6th Cir. 2019)). Courts may address these inquiries "in any order." *Id.*

**ARGUMENT**

Ms. Meeks's § 1983 claim should be dismissed because she can neither establish that her conduct was protected by the First Amendment nor show that Commissioner Lawrence violated clearly established law. *See DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021); *Guercio v. Brody*, 911 F.2d 1179, 1184 (6th Cir. 1990). The First Amendment does not protect Ms. Meeks's conduct because her interest in baselessly attacking those who share Mr. Kirk's political views as "White Supremacist[s]" does not outweigh the Department's interest in operating effectively for *all* the State's citizens. At the very least, Ms. Meeks cannot show that case law at the time she was fired clearly established that the balance of those interests was in her favor. Because Ms. Meeks has failed to state a claim for First Amendment retaliation, the Court should dismiss her Complaint entirely. At minimum, qualified immunity bars her individual-capacity claim against Commissioner Lawrence.

## I. Ms. Meeks Did Not Engage in Protected Conduct.

Ms. Meeks alleges that Commissioner Lawrence violated the First Amendment by terminating her because of her comment classifying Mr. Kirk and those who share his political views as white supremacists in the wake of his public murder. To succeed, she must demonstrate that the First Amendment protects her conduct. *DeCrane*, 12 F.4th at 594. But it doesn't. So, her claim fails as a matter of law, and Commissioner Lawrence is entitled to qualified immunity from Ms. Meeks's individual-capacity claim.[4]

The First Amendment does not protect all speech. *See, e.g.*, *Schenck v. United States*, 249 U.S. 47, 52 (1919) ("The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic."). Indeed, public-employee speech must clear three

---

[4] For purposes of this motion only, Commissioner Lawrence must accept the facts alleged in the Complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And while he limits discussion in this memorandum to whether Ms. Meeks can establish only certain elements of her First Amendment retaliation claim, Commissioner Lawrence preserves his right to challenge at future stages whether she can satisfy other necessary elements, *see DeCrane*, 12 F.4th at 593-94.

8

hurdles to arrive within the First Amendment's shelter. *DeCrane*, 12 F.4th at 594. First, the employee must speak as a private citizen rather than pursuant to the employee's job duties. *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006)). Second, the "First Amendment protects this speech only if it addresses a matter of public (rather than private) concern." *Id.* (citation omitted). Third, "the First Amendment protects the speech only if the employee's interest in speaking outweighs the employer's interest in operating—a test that has come to be called '*Pickering* balancing.'" *Id.* (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).

Here, Ms. Meeks's claim falters on at least the third requirement. She cannot show that her interest in attacking anyone who shares Mr. Kirk's political views as racists outweighs the Department's interest in operating effectively for *all* the State's citizens. The First Amendment does not protect her conduct. *See Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1293-94 (11th Cir. 2007) (applying *Pickering* to dismiss a plaintiff's free speech claim for failing to state a claim).

### A. Ms. Meeks has little First Amendment interest in her conduct here.

Ms. Meeks has only a minimal First Amendment interest in her social media activity here. Her comment "referenced a high-profile public event, albeit in a distasteful manner." *See Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 382 (6th Cir. 2024) (citation modified). And she alleges that she shared it via her personal Facebook page outside of work hours. *See* Compl. ¶ 39. But weighing the competing interests in this case requires considering "the manner, time, … place[,]" and "context" of Ms. Meeks's posts. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). These factors diminish her interest and place a thumb on the Department's side of the *Pickering* scale.

"Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the *Pickering* balance," *Darlingh v. Maddaleni*, 142 F.4th 558, 566 (7th Cir. 2025) (quoting *Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007)), than speech made "in a civil, non-threatening manner," *Davignon v. Hodgson*, 524 F.3d 91, 105 (1st Cir. 2008). Ms. Meeks's comment is very much the former. She did not offer

9

respectful, thoughtful discourse about Mr. Kirk's murder, his "public statements," or his "political views." *Contra* Compl. ¶ 57. Rather than engage with the beliefs Mr. Kirk advocated to disprove or refute them with logic, reason, or civility, Ms. Meeks defaulted to ad hominem attack of the worst kind. *Id.* ¶ 38. She defined Mr. Kirk and others who think like him as "White Supremacist[s]." *Id.* Such "unfounded accusations of racism are the modern[-]day equivalent of fighting words." *See Thomas v. Tenneco Packaging Co., Inc.*, 293 F.3d 1306, 1330 (11th Cir. 2002) (citation modified). "[B]ecause accusations of racism are taken so seriously in our society, allegations that are baseless— thereby serving only a frivolous or harassing purpose—are particularly offensive and provoke a strong response from the person accused, given the huge reputational costs involved." *Id.* Such baseless personal attacks are not "the well-informed" views of a government employee "engaging in civic discussion" that the public has some "interest in receiving." *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 538-39 (6th Cir. 2020).

Ms. Meeks's uncivil, provocative post also arrived at the wrong time and in the wrong place. It came shortly after Mr. Kirk's violent murder while emotions ran high. *See* Compl. ¶ 38. By making her offensive comment when she did, Ms. Meeks risked exacerbating public distress. And that risk was further heightened because she used "[a] social media platform [to] amplif[y] the distribution" of her incendiary message. *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 345 (4th Cir. 2017) (quoting *Livermore v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016)). "Writing on Facebook is accurately compared to 'writing a letter to a local newspaper' and 'suggests an intent to communicate to the public or to advance a political or social point of view beyond the employment context.'" *Hussey v. City of Cambridge*, 720 F. Supp. 3d 41, 54 (D. Mass. 2024) (quoting *Liverman*, 844 F.3d at 410). "[S]uch increased exposure amplifies the potential consequences to employers." *Id.* at 55. The viral nature of online posts enhances the reasonableness of state employers' concerns that an employee's speech will negatively impact and disrupt others inside and outside the organization.

Commissioner Lawrence had plenty of reasons for concern here. Ms. Meeks can't reasonably claim she meant for her comment to stay between her and her "battle budd[y]," Compl. ¶¶ 36-40; that's not how the internet works. Social media users "'gamble … in posting content to the internet' as there is a 'lack of control one has over its further dissemination.'" *Hussey*, 720 F. Supp. 3d at 54-55 (quoting *Duke v. Hamil*, 997 F. Supp. 2d 1291, 1300, 1302 (N.D. Ga. 2014)). Indeed, "[h]er decision to post inflammatory comments to [that] audience … carried a clear risk of amplification." *See Hedge-peth v. Britton*, 152 F.4th 789, 798 (7th Cir. 2025); *see also Shirinian v. Plowman*, No. 3:25-cv-528-KAC-JEM, 2025 WL 3680503, at *4 (E.D. Tenn. Dec. 18, 2025) (citing *Marquardt v. Carlton*, No. 21-3832, 2023 WL 395027, at *5 (6th Cir. 2023)); *Hussey*, 720 F. Supp. 3d at 54-55. And that risk was realized here, with nearly one hundred thousand people (and likely more at this point) viewing Ms. Meeks's attacking comment. *See* Compl. ¶¶ 38-42. Thus, the manner, time, place, and context of Ms. Meeks's comment all cut against any First Amendment interest she might otherwise have in commenting publicly on Mr. Kirk's murder.

### B. The Department's interest in effectively serving all Tennesseans is substantial.

Commissioner Lawrence reasonably determined that Ms. Meeks's virulent comment would disrupt the Department's operations. Speech can cause workplace disruption by, among other ways, "impair[ing] discipline by superiors or harmony among co-workers," negatively affecting "close working relationships for which personal loyalty and confidence are necessary," impeding the performance of the employee's duties, disrupting the employer's regular operations, or undermining its "mission." *Bennett*, 977 F.3d at 539-40 (citation modified). Under this rubric, Commissioner Lawrence had good reasons to believe Ms. Meeks's comment would cause internal and external disruption.

*First*, Ms. Meeks's comment impeded her ability to perform her duties. *See* Compl. ¶¶ 55-56, 58, 65. At the time she was fired, Ms. Meeks worked as a financial services investigator. *Id.* ¶¶ 2, 21. Whether "recommend[ing] an official investigation" or undertaking one, the Department's

11

investigators regularly "contact [complainants] for more facts and information," speak with witnesses, and otherwise interact with the public. *See* Tenn. Dep't of Com. & Ins., *Securities/Investment Complaint*, https://tinyurl.com/4hczhrby; Tenn. Dep't of Com. & Ins., *Insurance Agent/Agency Complaint*, https://tinyurl.com/3k8neauj. And their investigations involve sensitive subjects, like fraud, that carry significant potential penalties. Investigators therefore must be viewed—by complainants, targets, witnesses, and the public alike—as objective professionals who exercise unbiased judgment and give every fact full consideration. *See* Compl. ¶¶ 55-56, 58, 65.

But Ms. Meeks destroyed any perception of objectivity with her Facebook comment. She let it be known, Compl. ¶ 38, that she believes citizens with views like Mr. Kirk's are contemptable "White Supremacist[s]." *See Murrell v. Patriot Front*, 762 F. Supp. 3d 65, 73-75 (D. Mass 2025) (detailing white supremacists' hateful mission to "creat[e] a white ethnostate, in which whites would either dominate and rule over non-whites or in which non-whites could not live"). Because of her explicit "contempt," the large "segment of [Tennessee's] population" that shares Mr. Kirk's political views could reasonably regard Ms. Meeks in her role as an investigator "as oppressor rather than protector." *Bennett*, 977 F.3d at 543 (quoting *Locurto v. Giuliani*, 447 F.3d 159, 178 (2d Cir. 2006)).

Commissioner Lawrence therefore could reasonably conclude, *see* Compl. ¶¶ 55-56, 58, 65, that she "did 'not have the competencies necessary to be … effective'" in her role, *Shirinian*, 2025 WL 3680503, at *4 (quotation omitted). The Department "serves the public directly." *Bennett*, 977 F.3d 543. And Ms. Meeks's effectiveness as an investigator depends on the "respect and trust of the community and on the perception" that she acts "fairly, even-handedly, and without bias." *See id.* at 543 (emphasis removed). It was therefore reasonable for Commissioner Lawrence to predict that her comment attacking broad swaths of Tennesseans would "erode" confidence in her ability to serve in a position of trust, *see* Compl. ¶¶ 55-56, 58, 65, because certain citizens would be "less likely to report [incidents], to offer testimony as witnesses, and to rely on [her] for protection." *See id.*

12

Thereby, "the ability of [law enforcement] to do its work in the community is impaired." *Id.* By destroying the perception that she can unbiasedly serve *all* Tennesseans, Ms. Meeks's speech impeded her ability to perform her investigative duties effectively. *See id.*

*Second*, Commissioner Lawrence had a reasonable basis to conclude that Ms. Meeks's comment would create disharmony among the Department's employees. The Department's mission is to protect *all* Tennesseans while empowering *every* professional across the State. Tenn. Dep't of Com. & Ins., *Our Mission, Vision & Values*, https://tinyurl.com/4ufudnvx. Because achieving this mission necessarily requires considering diverse viewpoints, the Department employs numerous individuals with varied backgrounds, beliefs, and interests. That includes at least some employees who either share Mr. Kirk's views that Ms. Meeks believes are racist, are sympathetic to those views, or at minimum, believe that those views are not so contemptable.

Given the broad dissemination of Ms. Meeks's comment, *see* Compl. ¶ 42, Commissioner Lawrence could reasonably anticipate that it would spur "'nonstop conversation' in the office" among employees that would be disruptive. *See Bennett*, 977 F.3d at 540. Or, worse, that employees who hold views like Mr. Kirk's would struggle to "work side by side and to … work as a team" with Ms. Meeks. *See id.* (quotation omitted). Thus, it was reasonably predictable that Ms. Meeks's comment would negatively impact "close working relationships" with coworkers "for which personal loyalty and confidence are necessary." *Id.* at 540 (quoting *Rankin*, 483 U.S. at 388).

Nor were these concerns "speculative" given the "context" in which Ms. Meeks's "speech arose." *See Gillis v. Miller*, 845 F.3d 677, 685 n.2 (6th Cir. 2017). Again, these modern day "fighting words," *see Thomas*, 293 F.3d at 1330—expressed in the aftermath of a gruesome public murder— appeared on a platform designed to "amplif[y] the distribution," *Grutzmacher*, 851 F.3d at 345, of Ms. Meeks's incendiary "political or social point of view," *Hussey*, 720 F. Supp. 3d at 54. Given Ms. Meeks's role investigating sensitive matters for citizens of diverse viewpoints, her evident bias at

13

least would predictably raise concerns about whether she could effectively fulfill her duties. Worse still, coworkers with views like Mr. Kirk's would be left wondering how Ms. Meeks's articulated bias would play out in the workplace. Would she dismiss their input, recommendations, or concerns as merely the views of "White Supremacist[s]"?

And while Ms. Meeks does not allege facts suggesting that her speech directly "impaired discipline by superiors," it was reasonable for Commissioner Lawrence to anticipate that "any *inaction* … in the face of [her] derogatory speech could have been seen as an endorsement of the speech and impaired *future* discipline of similar derogatory statements." *Bennett*, 977 F.3d at 540.

*Third*, given the impediments to Ms. Meeks continuing in her role and the problems it would create internally, it was reasonable for Commissioner Lawrence to predict that her comment would disrupt the Department's regular operations. *See* Compl. ¶¶ 55-56, 58, 65. "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function." *Rankin*, 483 U.S. at 388. Here, with Ms. Meeks impeded in her role, *supra* at 11-13, others would need to step up, but Commissioner Lawrence reasonably assessed that other employees would have their own simultaneous distractions and challenges because of her post, *supra* at 13-14. This would all constrain the Department's ability to function effectively to achieve its core mission. "[A]voiding such interference can be a strong state interest." *Rankin*, 483 U.S. at 388.

*Finally*, Commissioner Lawrence reasonably concluded that Ms. Meeks's comment undermined the Department's mission and "br[ought] the State into disrepute." Compl. ¶ 65. By regulation and Code, the State requires its employees to treat every citizen they serve with respect and dignity. *Supra* at 5-6. For the Department, in particular, it is "vitally important that all department employees conduct themselves in a manner free of bias, demonstrat[ing] unquestionable integrity, reliability, and honesty." *See Bennett*, 977 F.3d at 541 (quotation omitted). That's because the success of the Department's mission is measured, at least in part, "by the perception and confidence the public has in the

14

employees representing the agency." *See id.* (same). Ms. Meeks's baseless accusations of racism against many of the citizens she serves negatively impacts the Department's mission to serve *every* Tennessean. *See* Compl. ¶¶ 55-56, 58, 65. Her comment did not comport with the Department's expectations for its employees, it "negatively impacted the [working] environment," it "increased the risk of violence," it brought the Department "into disrepute," and adversely affected the Department. *See Shirinian*, 2025 WL 3680503, at *4 (cleaned up). This all undermines the Department's mission, disrupting its interest in effective operations. *Id.*; *see Bennett*, 977 F.3d at 541-42.

Even so, Ms. Meeks alleges that there was no "*actual* disruption" at the Department because of her Facebook comment. *See, e.g.*, Compl. ¶¶ 2, 70-72 (emphasis added). Assuming, for now, that's true, *see Twombly*, 550 U.S. at 555, it doesn't matter. The Sixth Circuit does not require public employers "to allow events to unfold to the extent that the disruption … is manifest before taking action." *Gillis*, 845 F.3d at 687 (quoting *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 833-34 (8th Cir. 2015)). So Commissioner Lawrence "need not show actual disruption" to "prevail under the *Pickering* balancing test." *Id.* It is enough that he "could reasonably predict that the employee speech would cause disruption in light of 'the manner, time, and place' the speech was uttered, as well as 'the context in which the dispute arose.'" *Id.* (citation omitted) (quoting *Rankin*, 483 U.S. at 389). As explained, Commissioner Lawrence reasonably made that determination here.

### C. The Department's interests outweigh Ms. Meeks's, so her conduct is unprotected.

Given the predictable adverse consequences of Ms. Meeks's comment on her job performance, work relationships, and agency operations, the Department's interest in avoiding disruption outweighs Ms. Meeks's interest in baselessly accusing countless Tennesseans of being racist "White Supremacist[s]." So, the First Amendment does not protect her comment. For First Amendment protection, Ms. Meeks's interest in speaking must *outweigh* the Department's competing interest in effective operations. *DeCrane*, 12 F.4th at 594. But for numerous reasons just explained, the

15

Department had a significant interest in avoiding disruption to its operations, while Ms. Meek had little interest in revealing her bias against those with whom she disagrees. The First Amendment does not apply here. *See id.*

Even if "both sides ha[d] substantial interests on their side," the "public employer must win." *See Bennett*, 977 F.3d at 555 (Murphy, J., concurring in the judgment). That's because courts afford "greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." *Id.* (quoting *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion)). Indeed, public employers receive "a wide degree of deference" when, as here, "close working relationships are essential to fulfilling public responsibilities." *Connick v. Myers*, 461 U.S. 138, 151-52 (1983). History backs this public-employer-friendly "default rule of deference," as "until the 1950s, the government was not thought to have abridged the freedom of speech by curbing the tongues of its own employees." *Bennett*, 977 F.3d at 555 (Murphy, J., concurring in the judgment) (citation modified). Ms. Meeks cannot overcome the "substantial deference" afforded to the Department's interests. *See Bd. of Cnty. Commissioners, Wabaunsee Cnty., Kansas v. Umbehr*, 518 U.S. 668, 678 (1996).

In sum, Ms. Meeks cannot show that her interest in speaking ill of countless Tennesseans outweighs the Department's interests as a public employer serving those same citizens Ms. Meeks attacked. She has not alleged a First Amendment violation. *See Bennett*, 977 F.3d at 545. This means she fails to state a claim for First Amendment retaliation, *see DeCrane*, 12 F.4th at 594, and Commissioner Lawrence is entitled to qualified immunity, *see Crawford*, 15 F.4th at 762 (plaintiff must establish a constitutional violation to overcome qualified immunity).

## II. Even if Ms. Meeks's Conduct Were Protected, That Was Not Clearly Established When the Department Terminated Her Employment.

Commissioner Lawrence is entitled to qualified immunity even if the Court disagrees about the balance of interests here. State officials are only liable for violating "clearly established" rights.

*See Guercio*, 911 F.2d at 1184. And Ms. Meeks cannot carry *her* burden, *Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 295 (6th Cir. 2023), to show that when Commissioner Lawrence terminated her employment it was clearly established that she had engaged in conduct protected by the First Amendment.

"To be clearly established, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (cleaned up). It's not enough for a right to be clearly established "at a high level of generality." *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019) (quotation omitted). Courts "examine the asserted right 'in light of the specific context of the case, not as a broad general supposition.'" *Barber v. Miller*, 809 F.3d 840, 845 (6th Cir. 2015) (quoting *Lyons v. City of Xenia*, 417 F.3d 565, 571 (6th Cir. 2005)); *White v. Pauly*, 580 U.S. 73, 79 (2017) (requiring that "clearly established law must be 'particularized' to the facts of the case"). The unlawfulness of the official's action "must be apparent" "in the light of pre-existing law." *Rhodes v. Michigan*, 10 F.4th 665, 679 (6th Cir. 2021) (quotation omitted). But the First Amendment right Ms. Meeks claims here was not apparent from case law that existed when she was fired.

**1.** In the First Amendment retaliation context, it has been "clearly established for purposes of qualified immunity" that public employees have the "right to *engage in protected speech* without retaliation." *DeVooght v. City of Warren, Mich.*, 157 F.4th 893, 903 (6th Cir. 2025) (emphasis added). But that right is clearly established only to the extent that case law makes clear that the employee's speech is protected. *Guercio*, 911 F.2d at 1184-85. For that inquiry, it is not sufficient that "the general teachings of *Pickering*[]" were "clear at the time in question." *Id.* at 1184.

Rather, Ms. Meeks must establish that, when Commissioner Lawrence terminated her employment, case law made it impossible for administrators "of reasonable competence … [to] have disagreed upon whether her right to exercise her first amendment right to free speech … was outweighed by" the Department's interest in effective operations. *See id.* at 1185; *McElhaney v. Williams*, 81 F.4th

17

550, 557 (6th Cir. 2023) (asking "whether any reasonable official would have understood that [the employee's] speech was protected, and thus that the official could not retaliate against him").  In other words, it must have been clearly established "where the *Pickering* scale, with all of the parties' competing interests in the balance, would ultimately come to rest."  *Guercio*, 911 F.2d at 1189.  Here, the balance favors the Department, but at the very least, it was not clear that the balance would favor Ms. Meeks.  *Supra* § I (demonstrating that the balance of interests favors the Department).  Instead, Commissioner Lawrence "reasonably could have thought that [his] actions were consistent with the rights" that Ms. Meeks "claims have been violated."  *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988).

Bennett v. Metropolitan Government of Nashville & Davidson County* is particularly instructive.  Like Ms. Meeks, the plaintiff Bennett worked in a position of trust in an agency that "serv[ed] the public directly."  *Bennett*, 977 F.3d at 542-43.  Indeed, both Bennett and Ms. Meeks worked for agencies with law enforcement missions, requiring a "perception in the community that it enforces the law *fairly, even-handedly, and without bias*."  *Id.* at 543 (quotation omitted).  And like Ms. Meeks, Bennett made an offensive, racially-charged Facebook post that evidenced bias against a particular community, thereby impeding her ability to fulfill her job duties, causing workplace tension, and undermining her employer's mission.  *See id.* at 538-45.  Addressing such facts, the Sixth Circuit reversed the lower court's determination that *Pickering* balancing favored Bennett and held that the public employer's interest in effective operations won out in these circumstances.  *Id.*  Thus, as Commissioner Lawrence considered how to respond to Ms. Meeks's online comment, precedent clearly established that the First Amendment *did not* shield her conduct, not the other way around.

**2.**  Importantly, Commissioner Lawrence does not have the burden of coming up with cases establishing the reasonableness of his *Pickering* decision.  *See Pleasant View Baptist Church*, 78 F.4th at 295.  Rather, it's up to Ms. Meeks to direct the Court to case law making it *clear* that Commissioner Lawrence got the *Pickering* balance wrong.  *See Guercio*, 911 F.2d at 1185.  That's a tall task that Ms.

Meeks can't achieve.

Even though case law typically does not have to address the "very action in question" to clearly establish a right, *Rhodes*, 10 F.4th at 679 (quotation omitted), the nature of the *Pickering* inquiry requires close similarity. *See, e.g.*, *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995) ("[O]nly infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well-defined."). Deciding whether Ms. Meeks has a greater interest in attacking citizens with certain political views as racists or whether the Department has a greater interest in effective operations can be like "judging whether a particular line is longer than a particular rock is heavy." *See Noble*, 112 F.4th at 385 (Sutton, C.J., dissenting) (quoting *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in the judgment)). Sixth Circuit judges struggle with "[h]ow to make that call." *See id.*; *Bennett*, 977 F.3d at 547-56 (Murphy, J., concurring). So, for case law to have made it clear to Commissioner Lawrence here that Ms. Meeks's "right to exercise her first amendment right to free speech" outweighed the Department's interest in effective operations under these circumstances, *Guercio*, 911 F.2d at 1185, she'll need a highly similar case going her way.

But no such case exists. That's particularly so considering the abundance of case law making clear that public employers can take action against an employee to avoid predictable disruption because the employee's widely disseminated comments impede her job performance, work relationships, and the employer's mission. *See Shirinian*, 2025 WL 3680503, at *4 (citing *Rankin*, 483 U.S. at 388; *Bennett*, 977 F.3d at 539, 541; *Gillis*, 845 F.3d at 687; and *Marquardt*, 2023 WL 395027, at *5). Because the case law that existed at the time the Department terminated Ms. Meeks made it at least possible to "disagree" about the *Pickering* balance here, Commissioner Lawrence is entitled to qualified immunity. *Guercio*, 911 F.2d at 1185.

19

**3.** Qualified immunity requires immediate dismissal of Commissioner Lawrence in his individual-capacity.  Qualified immunity shields state officials "not merely from liability, but also from litigation and discovery."  *Myers v. City of Centerville*, 41 F.4th 746, 758 (6th Cir. 2022).  It follows that, as a defense against "suit rather than [just] liability," qualified immunity "must 'be resolved *prior to discovery*'" rather than afterwards, whenever possible.  *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009), and adding emphasis).  If it is "properly raised prior to discovery, the district court has" not just the option but the "duty to address it."  *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 522 (6th Cir. 2002)).

## CONCLUSION

For all these reasons, the Court should dismiss the Complaint because it fails to state a claim for First Amendment retaliation.  At minimum, qualified immunity requires dismissal of Ms. Meeks's individual-capacity claim against Commissioner Lawrence.

Date: February 23, 2026                    Respectfully submitted,


                                           */s/ Harrison Gray Kilgore*
                                           HARRISON GRAY KILGORE, BPR# 041842
                                           Senior Assistant Attorney General
                                             for Strategic Litigation
                                           ZACHARY L. BARKER, BPR# 035933
                                           Senior Assistant Attorney General
                                             Constitutional Defense Division
                                           Office of the Tennessee Attorney General
                                           P.O. Box 20207
                                           Nashville, Tennessee 37202
                                           (615) 741-8726
                                           Harrison.Kilgore@ag.tn.gov
                                           Zachary.Barker@ag.tn.gov

                                           *Counsel for Defendant Commissioner Lawrence in his*
                                             *official and individual capacities*

20

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's electronic filing system on this 23rd day of February, 2026 to all counsel of record.

Melody Fowler-Green
N. Chase Teeples
Yezbak Law Offices PLLC
P.O. Box 159033
Nashville, TN 37215-9937
Phone: 615-250-2000
Fax: 615-250-2020
mel@yezbaklaw.com
teeples@yezbaklaw.com

James C. Grant
Davis Wright Tremaine LLP
920 5th Ave., Suite 300
Seattle, WA 98104
Phone: 206-757-8096
Fax: 206-757-7096
jimgrant@dwt.com

*Counsel for Plaintiff*

Cary H. Davis
Greg H. Greubel
Foundation for Individual Rights and Expression
P.O. Box 40128
Philadelphia, PA 19106
Phone: 215-717-3473
cary.davis@fire.org
greg.greubel@fire.org

David H. Rubin
Foundation for Individual Rights and Expression
700 Pennsylvania Ave. SE Suite 340
Washington, DC 20003
Phone: 215-717-3473
david.rubin@fire.org

*Counsel for Plaintiff*

*/s/ Harrison Gray Kilgore*
HARRISON GRAY KILGORE
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
harrison.kilgore@ag.tn.gov

*Counsel for Defendant Commissioner Lawrence in his official and individual capacities*

21