# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MONICA MEEKS,

       *Plaintiff,*

    v.

CARTER LAWRENCE, in his individual
and official capacities as Commissioner of
Tennessee Department of Commerce and
Insurance;

       *Defendant*.

Civil Action No.: 3:25-cv-01431
Judge Aleta A. Trauger

JURY TRIAL DEMANDED

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## INTRODUCTION

Defendant Carter Lawrence claims a comment Plaintiff Monica Meeks made off-the-clock to a friend on Facebook about Charlie Kirk was so offensive that he was justified in firing Meeks in a matter of hours with no investigation. Lawrence did so notwithstanding that Meeks' employment record with the Tennessee Department of Commerce and Insurance (the "Department") was exemplary, co-workers raised no concerns, and the Department experienced no disruption to its work. And what was this "inflammatory," "insulting," and "racist" post (all words Lawrence uses in his motion now)? In a comment directed solely to her friend about his reposting of a meme eulogizing Charlie Kirk, Meeks made a friendly jab: "The way you tap dance for White Supremacist should be studied!" That's it. Lawrence terminated Meeks for these eleven words and nothing more.

Almost 50 years ago, the Supreme Court held in *Rankin v. McPherson*, 483 U.S. 378 (1987), that it is "clearly established" public employees have a First Amendment right to share their views about matters of public concern, and a state employer may not discharge them for doing so absent significant disruption to workplace operations. *Id.* at 383, 388. In short, a government employer may not "use authority over employees to silence discourse … simply because superiors disagree with the content of [the] speech." *Id.* at 384. The Sixth Circuit has reinforced this principle, holding just two years ago that a public employee terminated for sharing a meme critical of the Black Lives Matter movement was entitled to summary judgment on his First Amendment retaliation claim, explaining: "*Rankin* recognizes a wide parameter of protected speech, even allowing for hyperbole that references deadly violence." *Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 384 n.3 (6th Cir. 2024).

1

Lawrence does not dispute that Meeks made her comment as a private citizen and that it touched on a matter of public concern. Lawrence contests only the third element of the *Pickering* test, claiming Meeks' First Amendment rights are outweighed by the state's interest, "as an employer, in promoting the efficiency of the public services it performs." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968); *see also Rankin*, 483 U.S. at 384.

Lawrence misunderstands the law and misstates the Complaint's factual allegations, flouting the basic principle that, on a motion to dismiss, this Court must accept all well-pleaded allegations as true and draw all inferences in favor of the plaintiff. Lawrence contends Meeks' eleven-word comment attacked all Tennesseans and branded anyone who agreed with Charlie Kirk's views as "contemptible" and "racist White supremacists." Meeks never said anything remotely like this, and the Complaint says nothing of the sort. Lawrence insists Meeks' Facebook comment went "viral," but there are no such allegations in the Complaint. Lawrence cites other paragraphs of the Complaint as purportedly alleging it was reasonable for him to predict Meeks' Facebook comment would disrupt the Department's operations and harm employee working relationships, but the Complaint alleges just the opposite.

At bottom, Lawrence's motion and his defense to Meeks' claim fail for the same reasons. Lawrence does not claim Meeks' one Facebook comment caused any disruption to the Department. At most, Lawrence offers just his speculation that there *might have been* disruption, though no actual disruption ever occurred. Lawrence's attempt to argue his view of the facts has no place, of course, in this Court's consideration of a 12(b)(6) motion.

The facts as pled in the Complaint lead to only one conclusion: Lawrence fired Meeks because he disagreed with the personal political views she expressed online. This is quintessential viewpoint discrimination, one of the most "blatant" and "egregious" forms of government

retaliation against First Amendment-protected speech. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). The Court should deny Lawrence's motion to dismiss.

## BACKGROUND

**A.      Meeks Has Dedicated Her Career to Public Service.**

Monica Meeks has dedicated her working years to public service. Compl. ¶ 20. After honorably serving 20 years in the United States Army, Meeks began working for Tennessee state agencies. *Id.* ¶ 21. From 2016 to 2018, she worked as an Insurance Fraud Investigator at the Tennessee Department of Commerce and Insurance. *Id.* From 2018 until her termination, she worked as a Financial Services Investigator at the Department. *Id.*

Meeks consistently excelled in her role at the Department. *Id.* ¶ 26. For the past five years, Meeks received performance ratings of "Exceeds Expectations." *Id.* ¶ 27. At no time has anyone accused Meeks of treating an individual differently based upon their political leanings or any protected characteristic. *See id.* ¶¶ 27, 32–34. Quite the opposite. For example, in Meeks' most recent performance evaluation, her supervisor commended her "strong sense of personal accountability," "unwavering determination and commitment to doing what is right," "empathy and understanding," and "dedication and integrity." *Id.* ¶ 27.

On her own time, Meeks has often posted on her personal Facebook account, expressing her views about public issues. *Id.* ¶ 30. In doing so, Meeks took care not to identify herself as a state employee and expressly stated that all her content reflected her personal views alone. *Id.* Meeks' personal activity on social media never affected her ability to perform her job. *Id.* ¶ 32. No Department employee who worked with Meeks ever objected to her social media use. *Id.* ¶ 33. No member of the public that the Department served or with whom Meeks interacted ever commented or complained about her personal social media use. *Id.* ¶ 34.

3

**B.      Meeks Made a Comment on a Friend's Facebook Post After Charlie Kirk's Death.**

On September 10, 2025, Charlie Kirk was assassinated while speaking at Utah Valley University. *Id.* ¶ 35. The next day, Meeks' friend and fellow veteran, Ac Lopez, reposted a meme on his Facebook page eulogizing Kirk. *Id.* ¶ 36. Meeks responded to this meme with a comment: "The way you tap dance for White Supremacist should be studied!" *Id.* ¶ 38. Meeks' comment was a good-natured jab at her longtime friend, disagreeing with his political views, as millions of Americans do online every day. *Id.* ¶ 28. Meeks commented on Lopez's post from her personal Facebook account on her own time, after work. *Id.* ¶ 39. Her comment did not appear on her Facebook page, but only as a comment on Lopez's page. *Id.* ¶ 40.

**C.      An Online Commentator Found and Called Out Meeks' Facebook Comment to the Department.**

The day after Meeks commented on Lopez's Facebook post, a conservative online commentator (Virgil Davis Hunt) posted on X a screenshot of Meeks' comment next to a snippet from a document listing her as a Department employee. *Id.* ¶¶ 41–42. Hunt tagged the Department, so his X post went directly to the Department as well as to his several thousand X followers. *Id.* ¶ 43.

Within about an hour, the Department's X account received fourteen additional comments calling for Meeks' termination. *Id.* ¶ 44. They came from X users such as "Spicyorange72," "NonGMOKaren," "Bonerville Asskicker," and "HB SurfDog." *Id.* For example, "NonGMOKaren" wrote, "We are waiting for this vile person to be fired," while "Bonerville Asskicker" wrote, "Why do you employ people that support terrorism?" *Id.* There is no indication

that any of these hecklers' comments came from anyone who had ever dealt with the Department, that the comments were from Tennesseans, or that they were even posted by real people. *Id.* ¶ 45.[1]

For nothing more than her eleven-word comment to a Facebook friend on her own time, Meeks unknowingly became a target in a nationwide effort to attack people for making comments about Charlie Kirk and to get these people fired from their jobs. *Id.* ¶ 6 (citing Raphael Satter & A.J. Vicens, *The Charlie Kirk purge: How 600 Americans were punished in a pro-Trump crackdown*, REUTERS (Nov. 19, 2025), https://www.reuters.com/investigations/charlie-kirk-purge-how-600-americans-were-punished-pro-trump-crackdown-2025-11-19).[2]

**D.      The Department and Commissioner Lawrence Leapt Into Action to Fire Meeks.**

Based on the smattering of third-party comments on X, the Department leapt into action. Kevin Walters, the Department's Communications Director, was tasked with compiling information to provide a basis for firing Meeks. *Id.* ¶¶ 46–47. Because Meeks' Facebook profile did not identify her as a state employee, Walters searched other Internet sites and web pages going back at least four years to find information linking her to the Department. *Id.* ¶¶ 48–49. He eventually located two old posts identifying her as an employee, one of which was from the Department itself, where Assistant Commissioner Elizabeth Bowling praised Meeks after she was featured in an article in *Fraud Magazine*, saying: "Monica is especially deserving of this attention as she sets the standard for our Financial Services Investigation Unit section." *Id.* ¶ 49. Walters forwarded screenshots of the fourteen X comments and the two old posts about Meeks to his superiors. *Id.* ¶¶ 46, 50–51.

---

[1] X even initially flagged two of the comments as "Probable spam" and has since flagged two more in the same way. Compl. ¶ 45.

[2] *See also* Nicholas Bogel-Burroughs & Bernard Mokam, *A Broad Wave of Firings Followed Charlie Kirk's Assassination*, N.Y. TIMES (Sept. 26, 2025), https://www.nytimes.com/2025/09/26/us/kirk-critics-fired-free-speech.html.

In a hastily prepared letter recommending that Meeks be fired, Assistant Commissioner Bowling referred to the two screenshots about Meeks as "several posts, viewable by the public, which clearly identify [Meeks] as a Department employee." *Id.* ¶ 52. Bowling did not mention that, to make this connection, members of the public would have to do the sort of online sleuthing that Walters had done.

Lawrence fired Meeks the night of September 12, 2025, approximately six hours after the first criticism appeared on the Department's X page about her Facebook comment. *Id.* ¶ 53. Lawrence signed Meeks' termination letter at 8:06 pm, without waiting for a formal recommendation from his staff. *Id.* In the letter, Lawrence acknowledged that Meeks' Facebook comment was the sole reason for the termination, because, in his view, her comment was "inflammatory" and "insulting," and purportedly "brought extremely negative attention to [her] face and name." *Id.* ¶ 55.

Six minutes after the termination letter arrived in Meeks' email inbox, Lawrence announced her firing on the Department's official X account. *Id.* ¶ 64. In this public pronouncement, Lawrence reiterated that he terminated Meeks because of her Facebook comment about Charlie Kirk. *Id.* ¶¶ 65, 70. He asserted that "investigation into [Meeks'] social media … revealed bias and disregard toward the very people she was tasked with serving." *Id.* ¶ 68. Lawrence cited nothing to support this assertion, which was untrue. *Id.* The Department also published Lawrence's pronouncement on its Facebook, Instagram, and LinkedIn pages. *Id.* ¶ 66. Lawrence and the Department have never before publicly announced the termination of any Department employee, nor sought public favor for doing so. *Id.* ¶ 67. Lawrence did not assert that Meeks' comment caused any disruption to the Department or its work, or that any other employee had raised any concerns, or that he had any reason to believe there might be disruption. Notably,

6

his termination letter did not identify or allege any disruption to the Department's operations. *Id.* ¶¶ 55, 72. And for good reason—there was none. *Id.* ¶¶ 73–78.

**E.    Lawrence Moves to Dismiss, Disregarding Rule 12(b)(6) Requirements.**

In his motion to dismiss, Mem. in Supp. Def.'s Mot. to Dismiss (Dkt. No. 21, "MTD"), Lawrence asks this Court to look past the well-pleaded factual allegations in the Complaint and accept his conflicting characterizations instead. But this the Court may not do, as "[t]his approach flouts basic pleading rules." *Blackwell v. Nocerini*, 123 F.4th 479, 487 (6th Cir. 2024) ("The City Officials thus ask us to disregard the normal 'presumption of truth' that we must give to a complaint's well-pleaded facts based on their own conflicting story about the investigation.") (citing *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 442 (6th Cir. 2012)). A "rule 12(b)(6) motion should be decided solely on the complaint," *Diei v. Boyd*, 116 F.4th 637, 643 (6th Cir. 2024), and the burden of demonstrating that it fails to adequately state a claim falls on the defendant, *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019). Ignoring these basic principles, Lawrence's motion misrepresents and makes up facts in at least three ways.

First, Lawrence claims Meeks' Facebook comment attacked "Tennesseans whom she disagrees with politically," characterized citizens served by the Department as "racist" and "White Supremacists," and asserted that anyone who shared Kirk's political views was "contemptable and racist." *See, e.g.*, MTD at 1, 4, 6, 7, 8, 9, 10, 12, 15, 19; *see also id.* at 4, 5, 6, 8, 11, 16 (characterizing Meeks' comment as "reprehensible," "racist," "incendiary," "insulting," "virulent," "contemptable," and as "baselessly attacking those who share Mr. Kirk's political views" and "revealing her bias against those with whom she disagrees"). Meeks' one personal comment to her friend said nothing like this. Lawrence's attempt to twist Meeks' comment into a "vulgar, insulting, and defiant" screed "attacking anyone who shares Mr. Kirk's political views," MTD at 9 (internal quotation marks omitted), has no basis in fact.

Second, contrary to Lawrence's characterization, Meeks' post did not go "viral," nor was the Department "inundated" with "angry calls for action." *Id.* at 4–5, 11. The record reflects, as the Complaint alleges, that Lawrence fired Meeks based on fourteen pseudonymous comments on the Department's X page, none of which had anything to do with Meeks' work or Department operations. Compl. ¶¶ 41–47, 53, 55. There is, in fact, no indication anyone ever saw (or cared about) Meeks' comment to her Facebook friend until conservative commentator Virgil Davis Hunt flagged and republished it in an effort to spur others to demand Meeks' termination. *Id.* ¶¶ 41–42, 77.

Third, Lawrence claims he fired Meeks because she violated various Tennessee policies and regulations. MTD at 5–6. But Lawrence said nothing in his termination letter (nor has he otherwise ever explained) how Meeks allegedly violated the policies that supposedly applied. Compl. ¶ 58. And he allowed Meeks no opportunity to respond in the six minutes' time between when she was informed she was fired and the Department's pronouncements on X, Facebook, Instagram, and LinkedIn celebrating her dismissal. *Id.* ¶¶ 64, 66. In fact, Meeks did not violate any of the policies cited in Lawrence's termination letter. *Id.* ¶¶ 58–62, 68–69.

## ARGUMENT

Lawrence seeks dismissal based on his interpretation of the *Pickering* balancing test. He concedes the first two elements of *Pickering*—that Meeks spoke as a private citizen on a matter of public concern—but claims the Department's interest in efficiency outweighs Meeks' free speech interests. *See* MTD at 9. He further argues for qualified immunity, asserting that Meeks' First Amendment rights were not clearly established. Both arguments are flawed.

8

**A.** **Meeks' Interest in Speaking as a Private Citizen on a Matter of Public Concern Outweighs the Department's Asserted Interests.**

Lawrence's argument that Meeks' speech receives little First Amendment weight in the *Pickering* balance cannot survive a cursory review of Supreme Court and Sixth Circuit caselaw, and his arguments relying on out-of-circuit cases and positing a "fighting words" theory are baseless. Lawrence violated Meeks' First Amendment rights by terminating her based on outright viewpoint discrimination and unfounded speculation that disruption *might* have occurred at some indefinite future time.

**1.** **Meeks' speech is entitled to significant weight in the *Pickering* balance.**

Meeks' comment on the assassination of a public figure with a critique of that person's politics is speech in the First Amendment's heartland. The First Amendment has a long tradition of protecting speech in a variety of settings, including public employment, and particularly including speech that some (or many) would find "highly distasteful." *See Noble*, 112 F.4th at 383 (citing *Rankin*, 483 U.S. at 390–92; *Snyder v. Phelps*, 562 U.S. 443, 458, 461 (2011); *Matal v. Tam*, 582 U.S. 218, 246 (2017); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *Texas v. Johnson*, 491 U.S. 397, 399 (1989)). "The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of … public figures who … by reason of their fame, shape events in areas of concern to society at large." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 51 (1988) (internal quotation marks omitted). Out of this tradition, it takes only *Rankin* and *Noble* to clearly establish that an employee's comments about a widely discussed, politically charged killing receive significant First Amendment weight.

In *Rankin*, a public employee was fired for saying at work, after hearing of the attempted assassination of President Reagan: "'If they go for him again, I hope they get him.'" 483 U.S. at

380. Applying *Pickering*, the Supreme Court held that because there was "no evidence" the employee's comment "interfered with the efficient functioning of the office," the employer's interest in firing her could not outweigh her "rights under the First Amendment." *Id.* at 389, 392. The Court faulted the defendant for rushing to termination without any showing of disruption, explaining the First Amendment does not permit employers to "silence discourse, not because it hampers public functions but simply because [they] disagree with the content of employees' speech." *Id.* at 384.

*Noble* also involved public employee speech that many would find "insensitive," "distasteful," or "outrageous." 112 F.4th at 381–82. There, in the wake of nationwide protests following George Floyd's death, a public library security guard shared a meme on Facebook "with a shocking message—'ALL LIVES SPLATTER'—which was a crude word play on the message 'All Lives Matter,'" along with the phrase "NOBODY CARES ABOUT YOUR PROTEST" and a cartoon image of a car running over protesters. *Id.* at 378–79. The Sixth Circuit reversed summary judgment for the defendant and directed the district court to grant summary judgment to the plaintiff, holding "Noble's interest in his speech outweighs the Library's claimed efficiency interest because no evidence indicates that Noble's speech significantly hindered Library operations." *Id.* at 383. "Noble's interest in his speech receive[d] significant First Amendment weight" given that the "context in which it was made" was a "nationwide debate" about the Black Lives Matter protests, and "its general content" involved a "high-profile public event." *Id.* at 382 (internal quotation marks omitted).

*Rankin* and *Noble* clearly establish that the First Amendment gives great weight to Meeks' comment in the *Pickering* balance. As Lawrence admits, Meeks' comment addressed a nationwide debate about Charlie Kirk's views. *See* MTD at 3–4. Lawrence's argument that Meeks had little

First Amendment interest in speaking because her comment "arrived at the wrong time and in the wrong place" ignores the fact that the employee's comment in *Rankin*, like Meeks' comment, "came shortly after [a] violent murder [attempt] while emotions ran high." MTD at 10; *see Rankin*, 483 U.S. at 386. There is no "too soon" exception to the First Amendment in the law. To the contrary, because "'speech on public issues occupies the highest rung of the hierarchy of First Amendment values,'" the Supreme Court has held that "outrageous" and "hurtful" speech *during a veteran's funeral* was "'entitled to special protection.'" *Snyder*, 562 U.S. at 452, 458, 461 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). The employee's comment about President Reagan in *Rankin* and Meeks' comment about Kirk receive strong First Amendment protection in part *because* they "came on the heels of" matters "of heightened public attention." *Rankin*, 483 U.S. at 386. Lawrence concedes, as he must, that Meeks' comment "referenced a high-profile public event," just like the meme in *Noble*. MTD at 9 (quoting *Noble*, 112 F.4th at 382).

The out-of-circuit cases Lawrence relies on to claim Meeks has "only a minimal First Amendment interest in her social media activity here," MTD at 9–10, are inapposite. *Darlingh v. Maddaleni*, 142 F.4th 558 (7th Cir. 2025), involved an elementary school counselor who spoke at a public rally, identifying herself as an employee of the defendant school district and vowing not to support students with gender-identity concerns. *Id.* at 561. As the Seventh Circuit put it, the employee's "strident public pledge to perform her counseling duties in an exceedingly rigid way … conflicted with the school district's obligation to ensure a supportive educational environment and promote student and parental trust." *Id.* at 560.

Similarly, *Curran v. Cousins*, 509 F.3d 36 (1st Cir. 2007), concerned a correctional officer who made public statements online comparing his boss (the county sheriff) to Adolf Hitler, urging a violent attack by officers and referencing a "secret plot" to assassinate the sheriff as there had

been such a plot against Hitler. *Id.* at 48. On these facts, the First Circuit had little difficulty rejecting "Curran's argument that no one could have reasonably taken [his] speech as being either disrupting or threatening." *Id.* at 49.

As for *Davignon v. Hodgson*, 524 F.3d 91 (1st Cir. 2008), which involved pro-union employee speech, it provides no support for Lawrence. The court there found "scant evidence of actual disruption" and "not even a specter" of "potential disruption to workplace harmony." *Id.* at 104–05. True, the court characterized the speech as "civil" and "non-threatening," but the *Davignon* plaintiffs won the *Pickering* balance because the government's "'mere incantation of the phrase 'internal harmony in the workplace' [was] not enough to carry the day'" in the absence of actual evidence of disruption. *Id.* at 105. So too here.

In contrast to the speakers in *Darlingh* and *Curran*, Meeks never identified herself as an employee of the Department. Her Facebook comment to her friend about Charlie Kirk's politics was not related to her job or the Department. Lawrence leans heavily on a quote from *Curran* that "[s]peech done in a vulgar, insulting, and defiant manner is entitled to less weight in the *Pickering* balance." MTD at 9 (quoting *Curran*, 509 F.3d at 49; *see also Darlingh*, 142 F.4th at 566). But this proposition disregards *Rankin*'s controlling admonition that an "inappropriate or controversial" tone is "irrelevant" to whether speech deals with a matter of public concern, and that what matters in the *Pickering* balance is the speech's impact on "the effective functioning of the public employer's enterprise." 483 U.S. at 387, 388.

As the Sixth Circuit reaffirmed in *Noble*, the assertedly "distasteful," "abhorrent," "uncomfortable," or "offensive" nature of a public employee's private speech on a matter of public concern is "not enough to fire" them. *Noble*, 112 F.4th at 383–85. If anything, controversial speech is entitled to *more* weight in the *Pickering* balance because "the First Amendment has its most

urgent application for speech on public issues that many in our society might find dangerously wrong." *Bennett v. Metro Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 554 (6th Cir. 2020) (Murphy, J., concurring). The "First Amendment would serve no purpose if it safeguarded only majority views," as "[d]emocracy does that well enough on its own." *Id.* (internal quotation marks omitted).

Lawrence's claim that accusations of racism are the modern-day equivalent of fighting words, MTD at 10, is completely baseless. The case he relies on, *Thomas v. Tenneco Packaging Co., Inc.*, 293 F.3d 1306 (11th Cir. 2002), was not a First Amendment employment case and had nothing to do with *Pickering. Thomas* involved sanctions against an attorney who filed documents "saturated with invective directed at opposing counsel" including "thinly veiled physical threats," "an overt racial slur," and "conclusory comments that paint opposing counsel as a racist bigot." *Id.* at 1321. The Eleventh Circuit did not hold that "unfounded accusations of racism are the modern-day equivalent of fighting words," *see* MTD at 10 (cleaned up), but noted only that a district judge's statement to this effect was rhetorical and not inappropriate. *Thomas*, 293 F.3d at 1330. Lawrence's inapposite references to other First Amendment concepts cannot justify his termination of Meeks.[3]

Put simply, *Rankin* and *Noble* clearly establish that Meeks' one Facebook comment is entitled to First Amendment protection and substantial weight in the *Pickering* balance. As explained in the next section, Lawrence's side of the *Pickering* balance is nearly empty.

---

[3] The Supreme Court defined "fighting words" in *Chaplinsky v. New Hampshire* as "those which by their very utterance … tend to incite an immediate breach of the peace." 315 U.S. 568, 572 (1942). Anyone with a basic understanding of First Amendment law would appreciate that Meeks calling Charlie Kirk a "White Supremacist" in her Facebook comment does not even come close to fighting words. Moreover, the Supreme Court has noted the decline of the fighting-words doctrine and "that [it] is today a poor candidate for spinning off other First Amendment rules." *Counterman v. Colorado*, 600 U.S. 66, 77 n.4 (2023).

13

### 2. Lawrence's subjective disdain for Meeks' comment is not a legitimate basis for claiming her comment would disrupt the Department's work.

On the government employer's side of *Pickering*, the employer must show the employee's personal speech on a matter of public concern significantly disrupted operations. Here, Lawrence admits Meeks' eleven-word Facebook comment did not cause any disruption to the Department's work, but claims he could reasonably assume disruption because *he found* Meeks' speech "inflammatory," "insulting," "vulgar," "incendiary," "distasteful," "offensive," and "reprehensible." *See, e.g.*, MTD at 6, 9, 10. Yet, a supervisor's subjective assessment of a government employee's private speech is not a permissible basis for firing her, as the First Amendment "allows all perspectives, even the very offensive, to be heard." *Noble*, 112 F.4th at 383.

Lawrence fired Meeks because he disagreed with the content of her Facebook comment. As Lawrence's motion makes clear, he agreed with Charlie Kirk's politics and public statements and maintains that someone who disagreed (such as Meeks) is reprehensible. This is quintessential viewpoint discrimination, a particularly "egregious form" of discrimination against speech based on content. *Rosenberger*, 515 U.S. at 829. When the government targets "particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* The government may not punish speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*; *see also Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). The Supreme Court has said the same in the context of employee speech: A government employer may not "use authority over employees to silence discourse ... simply because superiors disagree with the content of [the] speech." *Rankin*, 483 U.S. at 384.

Instead, the Supreme Court has made clear that the "state interest element of the [*Pickering*] test focuses on the effective functioning of the public employer's enterprise." *Id.* at 388. To justify firing a public employee for speech on a matter of public concern, the employer must put forth evidence of "actual disruption" to workplace functions or "objectively reasonable" bases to conclude that disruption will occur because of the employee's speech. *Noble*, 112 F.4th at 384. Legitimate considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. Illegitimate considerations include the views of "the powers-that-be" or "wounded feelings of certain co-workers." *Noble*, 112 F.4th at 384.

Here, at the motion to dismiss stage, Lawrence cannot warp the Complaint to justify Meeks' termination based on any objectively reasonable grounds that disruption that did not occur, *might* occur. The Complaint alleges the Department experienced no interruptions or interference to its work from Meeks' Facebook comment. Compl. ¶¶ 70–78. Abandoning Rule 12(b)(6) principles, Lawrence speculates that Meeks' comment *might have* caused some Tennesseans to question her objectivity in doing her job. MTD at 11–12. But this argument is based on attenuated suppositions that individuals dealing with the Department (a) saw Meeks' Facebook comment, (b) took offense in the same way Lawrence claims he did, and therefore (c) concluded Meeks could not investigate insurance fraud in a professional manner as she had throughout her career with the Department. Nothing in the Complaint gives any semblance of reason to credit his speculation.

Much the same can be said about Lawrence's speculation that co-workers might not like what Meeks wrote (again assuming any co-worker ever saw the one comment), imagining

"nonstop conversation in the office." MTD at 13 (quoting *Bennett*, 977 F.3d at 540). Even if these hypothetical co-workers hypothetically complained about Meeks' post (none did), "alleged wounded feelings of certain co-workers" are "not enough" to fire a public employee for "hyperbolic speech." *Noble*, 112 F.4th at 384–85. People with differing views about Charlie Kirk or any other political issue can and should be expected to work together in a government office addressing insurance fraud.[4]

Lawrence argues he could predict disruption because he construed Meeks' one comment as "baseless accusations of racism against many of the citizens she serves." MTD at 15. Again, this is viewpoint discrimination, not an objectively reasonable basis to predict disruption. Moreover, to make this argument, Lawrence rewrites Meeks' comment from a simple statement critical of Charlie Kirk's views to a sweeping condemnation of all the conservative-leaning "citizens she serves." *Id.* at 1. But, by this logic, if Meeks' comment had *supported* Kirk's ideology, Lawrence could pin his termination decision on her condemnation of liberal-leaning citizens. In any event, as *Noble* makes clear, public employees do not have to conform to the government's definition of "respectful, thoughtful discourse," *see* MTD at 10, in their off-the-clock political opinions. *See Noble*, 112 F.4th at 381. Speech "attacking the political views held by many … citizens," MTD at 6, is "more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964).

Lawrence had no reasonable basis for predicting disruption. Instead, he based his decision on a handful of random, pseudonymous, and spam comments by X accounts, none of which "were

---

[4] Indeed, Lawrence insists the Department's "mission necessarily requires considering diverse viewpoints," and he asserts this is how the Department is managed. MTD at 13. The Department's policy and its stated adherence to job expectations belies his claim now that "employees … would struggle to 'work side by side and … as a team' with Ms. Meeks" due to her post. *Id.*

16

from anyone who had ever had any dealings with the Department," nor "from Tennesseans or even from real people." Compl. ¶ 45. Crediting these sorts of outsider complaints risks "constitutionalizing a heckler's veto." *Melton v. City of Forrest City*, 147 F.4th 896, 903 (8th Cir. 2025). "Enough outsider complaints could prevent government employees from speaking on any controversial subject, even on their own personal time." *Id.* (citing *Bennett*, 977 F.3d at 554 (Murphy, J., concurring)); *see also* Compl. ¶ 6 (describing "hundreds or thousands of employees across the country targeted by orchestrated campaigns aimed at causing them to lose their jobs for comments about Charlie Kirk"). Permitting speech-punishing decisions based on hecklers' views has no part in the *Pickering* analysis.

All of Lawrence's arguments boil down to his contention that Meeks' comment was so awful he could assume or forecast possible disruption. But *Noble* forecloses that argument because the "First Amendment does not permit one side of a debate to use the government to cancel the other side." *Noble*, 112 F.4th at 383. As in *Noble*, the government fired Meeks for a personal social media post that did not impact her job. *Id.* at 382; Compl. ¶ 39. "There is no evidence that [Meeks] took h[er] politics to work or that h[er] views on [Charlie Kirk] or any other political matter ever interfered with how [s]he performed h[er] job." *Noble*, 112 F.4th at 382; Compl. ¶¶ 26–34. Courts require a *reasonable* prediction of disruption to ensure the likes of "Bonerville Asskicker" and "NonGMOKaren*," id.* ¶ 44, don't get to dictate what opinions government employees are allowed to express on their personal time. *See Bennett*, 977 F.3d at 554 (Murphy, J., concurring). And as discussed more fully below, this case has nothing approaching the "substantial" disruption in *Bennett*. Instead, this case is like *Noble*: "no evidence indicates that [Meeks'] speech significantly hindered [Department] operations." 112 F.4th at 383.

While it is ultimately true a "public employer need not wait until an actual disruption to discipline an employee," its "anticipation of disruption must be objectively reasonable." *Id.* at 384. That objective requirement prevents the government from "always … regulating employees' speech on matters of public concern," which would reduce "*Pickering* to a shell" and transform public workplaces into "enclaves of totalitarianism." *Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021) (internal quotation marks omitted). Here, Lawrence relied on his *subjective* opinion that Meeks' speech "baselessly accus[es] countless Tennesseans of being racist 'White Supremacist[s].'" MTD at 15. There was no objective or reasonable basis for Lawrence to claim disruption: no coworker complaints, no constituent complaints, and no interruptions to Department functions. Compl. ¶¶ 30–34, 39. Just like the government agency in *Noble*, Lawrence fired an employee with a "spotless record" for expressing an opinion online. *Noble*, 112 F.4th at 384; *see* Compl. ¶¶ 26–27. "*Pickering* does not give the [government] carte blanche to take away [Meeks'] means of livelihood based on [her] speech." *Noble*, 112 F.4th at 385.

**B. Lawrence Is Not Entitled to Qualified Immunity Because He Violated Meeks' Clearly Established First Amendment Rights.**

Because Meeks has alleged that Lawrence violated her First Amendment rights, Lawrence is entitled to qualified immunity only if those rights were not clearly established. *Diei*, 116 F.4th at 648. A right is clearly established when officials have "fair warning" their conduct violates established law. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (quoting *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015)). An "official can be on notice that his conduct violates established law even in novel factual situations." *Id.* (quoting *Littlejohn v. Myers*, 684 F. App'x 563, 569 (6th Cir. 2017)). But here, the application of the law is anything but novel; it's clearly established.

Like his *Pickering* argument, Lawrence's qualified immunity argument is polluted with improper inferences, such as saying the Court must decide "whether Ms. Meeks has a greater interest in attacking citizens with certain political views as racists or whether the Department has a greater interest in effective operations." MTD at 19. But "[a]s with any other motion to dismiss, we perform [the qualified immunity] analysis while accepting the plaintiff's factual allegations as true and drawing all reasonable inferences in [her] favor." *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021).[5]

*Rankin* and *Noble* place the contours of Meeks' speech rights "beyond debate," *Diei*, 116 F.4th at 648 (citation omitted), making clear that public employers cannot terminate employees for sharing their views on a matter of public concern without a showing of significant disruption to the workplace. Lawrence tries and fails to rebut these two cases with *Bennett*, 977 F.3d at 530. *See* MTD at 13, 18. *Bennett*—decided following a jury trial, not at the motion-to-dismiss stage— actually helps Meeks, as it demonstrates what a real investigation into disruption looks like. *Bennett*, 977 F.3d at 536–37. Given the facts here, Lawrence cannot plausibly claim he did not violate Meeks' First Amendment rights.

### 1. *Rankin* and *Noble* clearly establish Meeks' First Amendment rights.

The Sixth Circuit has "repeatedly held that a public employee's right to engage in protected speech without retaliation is clearly established for purposes of qualified immunity." *DeVooght v. City of Warren*, 157 F.4th 893, 903 (6th Cir. 2025). More to the point, when Lawrence fired Meeks (as discussed above), *Rankin* and *Noble* had clearly established that terminating an employee for comments related to a widely discussed, politically charged killing (or attempted killing) that cause

---

[5] The Sixth Circuit accordingly "disfavors granting qualified immunity at the motion-to-dismiss stage." *Romero v. City of Lansing*, 159 F.4th 1002, 1008 (6th Cir. 2025).

no workplace disruption violates the First Amendment. Because Lawrence is required here to accept Meeks' allegations as true, "for the purposes of this pre-discovery motion to dismiss, this is a case where objective employers would not have disagreed about where the *Pickering* scale would have come to rest." *Higbee v. E. Michigan Univ.*, 399 F. Supp. 3d 694, 705 (E.D. Mich. 2019). Accordingly, "[a]s of now, the *Pickering* balancing test weighs starkly in [Meeks'] favor." *Id.*

### 2.      *Bennett* does nothing to help Lawrence establish qualified immunity.

Lawrence tries to distinguish *Rankin* and *Noble*, relying primarily on *Bennett* to argue that he is entitled to qualified immunity. MTD at 18. This reliance is misplaced.

In *Bennett*, a white emergency call center employee was fired for using the word "niggaz" in a Facebook comment. 977 F.3d at 534. The employee identified herself as a call center employee on her Facebook profile and did not include any disclaimer saying that views were hers alone. *Id.* at 534, 542. Co-workers complained immediately, leading to a "nonstop conversation" among employees who felt they could not trust or work with Bennett, and the employer (Metro) brought in a counselor for several weeks. *Id.* at 540; *see also id.* at 534–36. The complaints from co-workers and others led Metro to conduct a multi-week investigation into the workplace disruption, which took employees away from their duties and resulted in "insufficient coverage of incoming calls." *Id.* at 535–36, 540. Throughout this time, Bennett showed no concern for her colleagues but instead insisted they should apologize to her. *Id.* at 540. Following the investigation, Metro terminated Bennett because of the disruption to the work environment she had caused. *Id.*

Meeks' case is easily distinguishable. Unlike Bennett, Meeks did not identify herself as a public employee and included a disclaimer stating her comments were her own. Compl. ¶¶ 30, 48–52. That matters, because the Sixth Circuit noted that "[h]ad Bennett's profile been private, or had

it not indicated that she worked for Metro, Metro's argument for terminating [her] would not be as strong." *Bennett*, 977 F.3d at 541. That's the scenario here. Meeks went to great lengths to distance her Facebook presence from her government job. The Department had to conduct Internet research spanning several years to find a way to connect Meeks to the Department so as to fire her. Compl. ¶¶ 30, 48–52.

Further distinguishing this case from *Bennett,* where there was clear disruption among co-workers, all the complaints about Meeks' comment came from online commenters unconnected to the Department*. Id.* ¶¶ 32–33, 45. There was also no investigation, as Lawrence fired Meeks "approximately six hours after the first criticism on X about her private Facebook comment," "without waiting for a formal recommendation from his staff." *Id.* ¶ 53. Nor was there "interruption or interference with the Department's provision of services to Tennesseans as a result of Meeks' personal Facebook comment." *Id.* ¶¶ 73, 75–76.

And as noted above, *Noble* (which the Sixth Circuit decided after *Bennett*) clarified that even allegedly offensive speech must disrupt the work environment to provide any legitimate basis for terminating an employee. *Noble*, 112 F.4th at 383. In short, nothing in *Bennett* undermines the law clearly established by *Rankin* and *Noble*.

## CONCLUSION

The *Pickering* balance tips sharply in Meeks' favor. Lawrence chose to appease a handful of online hecklers rather than stay true to the principles in *Rankin* and *Noble* that protect Meeks' First Amendment rights. This Court should deny his motion to dismiss.

Dated: March 16, 2026

*/s/ Greg H. Greubel*
GREG HAROLD GREUBEL*
PA Bar No. 321130; NJ Bar No. 171622025
JAMES C. GRANT*

WA Bar No. 14358
CARY DAVIS*
PA Bar No. 338042
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
P.O. Box 40128
Philadelphia, PA 19106
Tel: (215) 717-3473
greg.greubel@fire.org
jim.grant@fire.org
cary.davis@fire.org

DAVID RUBIN*
CA Bar No. 329852; D.C. Bar No. 90021100
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
david.rubin@fire.org

MELODY FOWLER-GREEN
TN Bar No. 023266
YEZBAK LAW OFFICES PLLC
2901 Dobbs Ave.
Nashville, TN 37211
Tel: (610) 250-2000
mel@yezbaklaw.com

*Admitted pro hac vice

*Counsel for Plaintiff Monica Meeks*